UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY R. FARRAR, as Chapter 7 Trustee of the bankruptcy estate in In re: Cavanaugh, United States Bankruptcy Court, Eastern District of California, Case No. 13-92200,<br><br>          Plaintiff,<br><br>      v.<br><br>AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY, AEROSPACE INSURANCE MANAGERS, INC., AEROSPACE INSURANCE SERVICES,<br><br>          Defendants. | No. 1:15-CV-01177-TLN-SKO<br><br><br>**MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

This matter is before the Court pursuant to Defendants Aerospace Insurance Managers, Inc. ("AIM"), and Aerospace Insurance Services' ("AIS") (collectively, "Aerospace Defendants") Motion for Judgment on the Pleadings (ECF No. 53) and American National Property and Casualty Company ("ANPAC") and Aerospace Defendants' (collectively "Defendants") Motion for Summary Judgment (ECF No. 54). Plaintiff Gary R. Farrar, as Chapter 7 Trustee of the bankruptcy estate in *In re: Cavanaugh United States Bankruptcy Court*, Eastern District of California, Case No. 13-92200 ("Plaintiff") opposes the Motion for Judgment on the Pleadings (ECF No. 59) and the Motion for Summary Judgment (ECF No. 61). Defendants have filed

1

replies (ECF Nos. 62, 63). For the reasons set forth below, the Court hereby GRANTS the Aerospace Defendants' Motion for Judgment on the Pleadings and GRANTS Defendants' Motion for Summary Judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The instant action involves a helicopter crash that followed William Coulter's ("Coulter") faulty maintenance on William Cavanaugh's ("Cavanaugh") helicopter. (ECF No. 1 ¶ 5; ECF No. 61 at 6.) During the maintenance, Coulter allegedly damaged the helicopter's pneumatic control fuel tube while installing the tube. (ECF No. 54-2 ¶ 76; ECF No. 61 at 6.) The pilot, Cavanaugh, sued Coulter for injuries he sustained in the resulting crash. (ECF No. 1 ¶ 5.) Coulter tendered the claim to his insurance company, ANPAC[1], which rejected the claim. (ECF No. 1 ¶ 5.) Coulter and Cavanaugh submitted the matter to binding arbitration, and the arbitrator found Coulter was negligent and awarded Cavanaugh $1,458,085. (ECF No. 1 ¶ 7–8; ECF No. 54-2 ¶¶ 82, 83.) Coulter subsequently assigned his rights under his insurance policy to Cavanaugh to collect on any judgment. (ECF No. 1 ¶ 7.) Cavanaugh then filed for Chapter 7 bankruptcy. As a result, Plaintiff owns and is pursuing the instant action to recover the judgment from ANPAC under breach of contract and breach of the implied covenant of good faith and fair dealing causes of action. (ECF No. 1 at 3–6.)

### A. ANPAC Insurance Policies

In 2008, Coulter purchased an annual airport liability insurance policy (the "Policy") from ANPAC. (ECF No. 54-4 at 1.) For the next two years, Coulter purchased this same policy from ANPAC. (ECF No. 54-4 at 20, 39.) In 2010, ANPAC informed Coulter that ANPAC would not offer a renewal policy, but substantially similar coverage would be available through its sister company, Hallmark American Insurance Company ("Hallmark"). (ECF No. 54-1 at 12.) From 2010 until 2012, Coulter purchased three identical insurance policies from Hallmark annually. (ECF No. 54-4 at 59, 87, 170.)

///

---

[1] ANPAC is an insurance provider that offers a range of aviation insurance coverage. (*See* ECF No. 54-2 ¶¶ 1, 3; ECF No. 54-1 at 7–9.)

*i.     2009–2010 ANPAC Insurance Policy*

The 2009–2010 ANPAC Policy is the relevant policy at issue.  (ECF No. 54-4 at 39.)  The CID within the Policy contains pertinent information such as the insurer's name, the insured's name and contact information, the purchased coverage, the total policy coverage limit, and the premium the insured pays.  (ECF No. 54-4 at 39.)  The Policy uses the terms "we" and "our" when referring to the insuring entity.  (ECF No. 54-4 at 66–67 ("We agree to pay on your behalf all sums which you or someone we protect becomes legally obligated . . . ").)  The Policy defines "we" and "our" as "the insurance company named in the Coverage Identification Page" ("CID").  (ECF No. 54-4 at 66.)  ANPAC is listed at the top of the 2009–2010 CID.  (ECF No. 54-4 at 39.)  The Policy identifies the "Named Insurer" as Bill Coulter dba Castle Aviation & Repair.  (ECF No. 54-4 at 39.)  The signature block provides the signature of the Aviation Managers and the countersignature of an authorized representative.  (ECF No. 54-4 at 39.)  The Policy defines "Aviation Managers" as "Aerospace Insurance Services which manages our aviation insurance business for us."  (ECF No. 54-4 at 18.)  A representative of AIS signed the CID as "Aviation Managers" and "Authorized Representative" for ANPAC.  (ECF No. 54-4 at 39.)

The Policy includes five options for coverage under the "Bodily Injury and Property Damage Liability" heading.  (ECF No. 54-4 at 39.)  These categories are labeled: (1) Hazard Division 1: Airport Operations; (2) Hazard Division 2: Products and Completed Operations; (3) Hazard Division 3: Independent Contractors; (4) Hazard Division 4: Contractual Liability; and (5) Hazard Division 5: Fire Legal Liability.  (ECF No. 54-4 at 39.)  Coulter only selected to purchase coverage under Hazard Division 1: Airport Operations.  (ECF No. 54-4 at 39.)  The CID shows Coulter's Policy provided coverage under this category with a $1 million limit.  (ECF No. 54-4 at 39.)  The Policy defines Airport Operations as "[t]he ownership, maintenance, operation or use at the airport and all operations necessary thereto, excluding liability arising out of Hazard Divisions 1 through 4."  (ECF No. 54-4 at 46.)

Coulter declined to purchase the other potential coverage options.  (ECF No. 54-4 at 39.)  The unpurchased category, Hazard Division 2: Products and Completed Operations ("Products and Completed Operations"), provides coverage for:

1.     Goods or products manufactured, sold, handled or distributed by you in connection with the ownership, maintenance, operation or use of the airport if the occurrence happens after possession of the goods or products has been relinquished by you to others; and

2.     Service operations performed by you in connection with the ownership, maintenance, operation or use of the airport if the occurrence happens after the services have been completed or abandoned.  Service operations will not be deemed incomplete because they are improperly or defectively performed or because further operations may be required pursuant to a service or maintenance agreement.

We only provide coverage under Hazard Division 2 for liability arising out of goods or products or service operations that are identified as covered classes in a "Hazard Description Schedule" attached to your policy, excluding liability arising out of Hazard Division 4, Contractual Liability.

(ECF No. 54-4 at 46.)

On October 1, 2009, Coulter signed an Airport Liability Coverage Declination ("Declination").  (ECF No. 54-4 at 144.)  The document acknowledged that Coulter "elected not to purchase liability insurance covering [Coulter's] liability for bodily injury or property damages arising out of [Coulter's] Products and Completed Operations."  (ECF No. 54-4 at 144.)  It further provided that Coulter "underst[ood] that the airport liability policy that [he] [purchased] D[ID] NOT INCLUDE coverage for product liability or liability arising out [his] completed operations."  (ECF No. 54-4 at 144.)  Finally, it stated that Coulter understood that ANPAC "is under no obligation to provide [Coulter] or any other person . . . with a defense with respect to any claims for property damage or bodily injury as the result of any accident claimed to arise from [Coulter's] products or completed operations."  (ECF No. 54-4 at 144.)  Coulter signed a similar disclaimer for Hangkeeper's Liability Coverage, another coverage option ANPAC offers.  (ECF No. 54-4 at 144.)

            ii.      Scrivener's Error[2]

On April 28, 2017, ANPAC filed a First Amended Third-Party Complaint ("Third-Party Complaint") seeking to reform the Policy.  (ECF No. 49.)  ANPAC asserts reformation is proper

---

[2]      A Scrivener's Error permits a typographical error in a written contract to be corrected by parol evidence if the evidence is clear, convincing and precise.  Doctrine of Scrivener's Error, Black's Law Dictionary (10th ed. 2014).

4

because a scrivener's error incorrectly refers to Hazard Divisions 1 through 4 instead of Hazard Divisions 2 through 4. (ECF No. 49 ¶ 22–23.) This scrivener's error appeared in ANPAC's Policy for each year Coulter purchased coverage. (*See* ECF No. 54-4 at 7, 46.) The Policy, as written, provides that coverage under Hazard Division 1: Airport Operations includes "[t]he ownership, maintenance, operation or use of the airport and all operations necessary thereto, excluding liability arising out of Hazard Divisions *1 through 4*." (ECF No. 54-4 at 7, 46 (emphasis added).) The third-party complaint seeks to reform the contract to exclude coverage from "liability arising out of Hazard Divisions *2 through 4*," instead of "1 through 4" as it is currently written. (ECF No. 49 ¶ 23.) ANPAC argues the Policy at issue erroneously excludes Hazard Division 1: Airport Operations coverage, which is the insurance coverage that Coulter purchased each year. (ECF No. 49 ¶ 22.)

## B.     Underlying Incident

On February 10, 2010, Cavanaugh crashed his helicopter near Escalon, California when his helicopter experienced an unexpected and sudden loss of power.[3] (ECF No. 54-1 at 14.) Coulter, who owned Castle Aviation and Repair, serviced the helicopter prior to the crash. (ECF No. 61 at 6.) On January 10, 2011, Cavanaugh filed a liability action (the "Underlying Action") against Coulter alleging a single cause of action for negligence. (ECF No. 54-2 ¶ 75.) The complaint alleged that Coulter improperly installed a PC tube, which caused the helicopter's loss of power. (ECF No. 54-2 ¶ 76.) Coulter did not tender the Underlying Action to ANPAC. (ECF No. 54-2 at 77.)

On May 6, 2014, Cavanaugh's attorney, Erick M. Abramson ("Abramson"), sent a letter to Hallmark setting forth a demand under the $1 million policy limit. (ECF No. 54-4 at 153–56.) In his letter, Abramson detailed the investigation completed by the National Transportation Safety Board and engine manufacturer Rolls-Royce Corporation ("Rolls-Royce"). (ECF No. 54-4 at 153–54.) Rolls-Royce concluded the PC tube had been improperly installed because it was bent, which induced misalignment. (ECF No. 54-4 at 154.)

---

[3]     The ANPAC 2009–2010 policy is the relevant insurance policy because the accident occurred during this coverage period. (ECF No. 54-4 at 39.)

On June 13, 2014, Warren J. Mueller III ("Mueller") from Aerospace Claims Management, the aviation managers for ANPAC, sent a letter to Coulter denying coverage for the Underlying Action. (ECF No. 54-4 at 157–60.) The letter stated, "the policy of Insurance issued to you by ANPAC does not provide coverage for the claim being submitted." (ECF No. 54-4 at 157.) Mueller further explained that Coulter's policy "does not provide coverage for Products and Completed Operations." (ECF No. 54-4 at 157.)

Cavanaugh and Coulter submitted the Underlying Action to binding arbitration. (ECF No. 54-2 ¶ 82.) The arbitrator found, among other things, that Coulter either "failed to adequately inspect or somehow managed to inadvertently damage the line himself," which caused the helicopter accident. (ECF No. 54-2 ¶ 82.) On June 23, 2014, he awarded Cavanaugh $1,458,085 in damages. (ECF No. 54-2 ¶ 83.) Coulter allegedly assigned his rights under the ANPAC policy to Cavanaugh as a means of satisfying the judgment against him. (ECF No. 54-2 ¶ 85.)

### C.     Present Action

Following the arbitration judgment, Cavanaugh filed the present lawsuit against ANPAC, AIS, and AIM. (ECF No. 1.) Cavanaugh sought payment under the Policy as well as damages for breach of contract and breach of the implied covenant of good faith and fair dealing. (ECF No. 1 at 3–5.) On April 28, 2017, ANPAC filed the First Amended Third-Party Complaint seeking to reform the Policy to correct the scrivener's error located under Hazard Division 1. (ECF No. 49 at 5.) The operative Third-Party Complaint argues the Policy incorrectly "exclude[ed] from coverage 'liability arising out of Hazard Divisions 1 through 4.'" (ECF No. 49 ¶ 22.) The Third-Party Complaint seeks to reform the Policy to reflect the contracting parties' mutual intent for the Policy to read "excluding liability arising out of Hazard Divisions 2 through 4." (ECF No. 49 ¶ 23.) In the present action, Gary R. Farrar ("Plaintiff"), the Chapter 7 Trustee, owns and is pursuing Cavanaugh's claims. (ECF No. 61 at 6.)

## II.     STANDARD OF LAW

### A.     Motion for Judgment on the Pleadings

After the pleadings are closed, any party may move for judgment on the pleadings

pursuant to Federal Rule of Civil Procedure 12(c). Fed. R. Civ. P. 12(c). "A Rule 12(c) motion challenges the legal sufficiency of the opposing party's pleadings and operates in much the same manner as a motion to dismiss under Rule 12(b)(6)." *Morgan v. Cty. of Yolo*, 436 F. Supp. 2d 1152, 1154–55 (E.D. Cal. 2006). "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989). "[T]he allegations of the non-moving party must be accepted as true." *Id.* After assessing the allegations in the complaint along with the materials to which the court may take judicial notice, the court may grant a Rule 12(c) motion for judgment on the pleadings if "it appears 'beyond doubt that the [non-moving party] cannot prove any facts that would support his claim for relief.'" *Morgan*, 436 F. Supp. 2d at 1155 (quoting *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003)).

### B. Motion for Summary Judgment

Summary judgment is appropriate when the moving party demonstrates no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotations omitted). Indeed, summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

If the moving party meets its initial responsibility, the burden then shifts to the opposing

party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits and/or admissible discovery material in support of its contention that a dispute exists. Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 251–52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 288–89. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of

1  fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587.

2  **III.    ANALYSIS**

3      Defendants bring two separate motions: (1) a Motion for Judgment on the Pleadings filed

4  by the Aerospace Defendants (ECF No. 53); and (2) a Motion for Summary Judgment filed by all

5  Defendants (ECF No. 54).  The Court will address each motion separately.

6              A.    Motion for Judgment on the Pleadings

7      Defendants AIS and AIM (collectively, "Aerospace Defendants") move for judgment on

8  the pleadings, arguing that neither AIS nor AIM was a contracting party to the Policy.  (ECF No.

9  53 at 2.)  Aerospace Defendants argue they are authorized representatives or, at most, ANPAC's

10 "agents who signed the Policy on behalf of a disclosed principal."  (ECF No. 63 at 7.)  Aerospace

11 Defendants claim that as ANPAC's agents, they were not parties to the contract, so they assert

12 that none of the breach of contract claims can survive against them.  (ECF No. 63 at 4.)

13 Plaintiffs, in response, allege Aerospace Defendants acted as "alter-egos, co-conspirators, [and]

14 partners" of ANPAC, and therefore were in privity of contract with Coulter.  (ECF No. 59 at 2.)

15      It is well-settled under California law that, "[w]here an agent negotiates a contract for a

16 disclosed principal, the agent is not personally liable on the contract without an express

17 assumption of liability."  *Cline v. Atwood*, 241 Cal. App. 2d 108, 113 (1966); *Hollywood Nat.*

18 *Bank v. Int'l Bus. Machines Corp.*, 38 Cal. App. 3d 607, 617 (Ct. App. 1974) ("An agent who

19 signs an agreement in his own name is personally liable unless he indicates 'on the writing itself .

20 . . his intention to bind the principal only.").  Further, "[w]here an agent is duly constituted and

21 names his principal and contracts in his name and does not exceed his authority, the principal is

22 responsible and not the agent."  *Filippo Indus. Inc. v. Sun Ins. Co. of New York*, 74 Cal. App. 4th

23 1429, 1442 (1999).  When an agent signs a contract on behalf of a disclosed principal, "the

24 principal is liable [under the contract] and not the agent."  *Id*; *see also Lippert v. Bailey*, 241 Cal.

25 App. 2d 376, 382 (1966) ("Where the signature as agent and not as a principal appears on the face

26 of the contract, the principal is liable and not the agent.").  Therefore, a breach of contract claim

27 is inapplicable to an agent of a disclosed principal because "an agent cannot be held liable for

28 breach of a duty which flows from a contract to which he is not party."  *Filippo Indus.*, 74 Cal.

App. 4th at 1443.

Aerospace Defendants claim they acted as ANPAC's agents when an AIS representative signed the Policy as "Aviation Managers" and "Authorized Representative." (ECF No. 63 at 6.) For "a party to a transaction to be deemed acting as an agent of a disclosed principal[,] such agency must be communicated in a manner that causes it to appear from the transaction that the parties intend to bind only the principal and not the agent." *Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc.*, 205 Cal. App. 3d 442, 450 (1988). Aerospace Defendants point to numerous pieces of evidence that show the Policy contract existed only between Coulter and ANPAC. First, the Policy, on its face, identifies ANPAC as the insurance company providing the coverage. (ECF No. 54-4 at 39.) Second, the Policy explicitly defines the parties to the contract as "the insurance company named on the Coverage Identification Page," which is ANPAC, and the person(s) identified as "Named Insured," which is "Bil[l] Coulter dba Castle Aviation & Repair." (ECF No. 54-4 at 39, 66.) Finally, when Coulter received confirmation of his Policy, the confirmation stated the "coverage [wa]s offered through American National Property & Casualty Company for an annual term." (ECF No. 54-4 at 145.)

Moreover, the Policy expressly defines Aerospace Defendants' relationship to ANPAC. For example, the Policy defines its "Aviation Managers" as "Aerospace Insurance Services which manages our aviation insurance business for us." (ECF No. 54-4 at 18.) Also, the Policy required four signatures to be effective: AIM as "Authorized Representative"; AIS as "Aviation Managers"; ANPAC's president, Gregory V. Ostergren; and ANPAC's secretary, Robert J. Campbell. (ECF No. 54-4 at 39; ECF No. 53-2 at 16.) Aerospace Defendants contend "the signatures of AIS or AIM w[ere] necessary to complete the contract between Mr. Coulter and ANPAC." (ECF No. 63 at 6.) Plaintiff, on the other hand, argues the Aerospace Defendants' signatures, rather than facilitating the execution of the contract, bind them to the contract. (ECF No. 59 at 4.) The Court is not persuaded by this argument because ANPAC was disclosed to Coulter at the outset as the insurance company providing him coverage. (ECF No. 54-4 at 138); *see Jones v. AIG Risk Mgmt., Inc.*, 726 F. Supp. 2d 1049, 1055 (N.D. Cal. 2010) (stating "the fact that [insurer's putative agent] allegedly played a role in the handling of [Plaintiff's] claim is not

10

sufficient to establish that it was a party to the contract"). Each time Coulter chose to renew the Policy, he was informed of the insurance company responsible for providing coverage — ANPAC for the first three years and Hallmark for the remaining two years. (*See* ECF No. 54-1 at 12.) Besides the fact that the Policy expressly names the parties to the contract on the Policy's face, the communications between Coulter and Aerospace Defendants clearly established that the insurance coverage was to be provided by ANPAC, and no one else. *See G.W. Andersen Constr. Co. v. Mars Sales*, 164 Cal. App. 3d 326, 412–13 (1985) (stating "[t]he fact of agency and the identity of the principal may both be disclosed to or known by the other party other than from the contract itself").

Accordingly, the Court finds Aerospace Defendants were acting as agents for ANPAC, a disclosed principal. As agents acting on behalf of a disclosed principal, the Aerospace Defendants were not parties to the Policy, and thus, cannot be liable for any breach of contract claims, including breach of the implied covenant of good faith and fair dealing. *See Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 576 (1973) (stating agents were not parties to the agreement, and therefore were not subject to an implied duty of good faith and fair dealing).

Moreover, Plaintiff argues Aerospace Defendants acted as "co-conspirators, partners, and joint venturers" with ANPAC. (ECF No. 59 at 6.) However, Plaintiff has cited no authority to support this contention, nor alleged any facts to show a conspiracy, partnership, or joint venture. Plaintiff's pleadings, instead, contain conclusory allegations that cannot survive the requisite pleading standards. *See Sever v. Glickman*, 298 F. Supp. 2d 267, 272 (D. Conn. 2004) (dismissing a breach of contract claim because the complaint, which alleged an agency relationship existed, contained a "conclusory statement, wholly unsupported by factual allegations" that a defendant was "authorized to contract for [another defendant]"); s*ee also Morgan*, 436 F. Supp. 2d at 1154–55 (stating, "[a] Rule 12(c) motion challenges the legal sufficiency of the opposing party's pleadings and operates in much the same manner as a motion to dismiss under Rule 12(b)(6)"). As such, the Court GRANTS Defendants' Motion for Judgment on the Pleadings.

///

B.     Motion for Summary Judgment

ANPAC[4] moves for summary judgment arguing: (1) the ANPAC Policy should be reformed to reflect the mutual intention of the contracting parties; (2) each of Plaintiff's claims fail because Cavanaugh's claim in the Underlying Action falls outside of Coulter's insurance coverage with ANPAC; and (3) Plaintiff's punitive damages claim fails because there is no evidence of malice, oppression, or fraud.  (ECF No. 54-1 at 7.)  The Court will address each argument in turn.

*i.     Reformation*

In its motion for summary judgment to reform the Policy, ANPAC argues that reformation of the Policy is proper to correct a scrivener's error in the Policy.  (ECF No. 54-1 at 16.)  "The court may reform [a] contract to capture the terms upon which the parties had a meeting of the minds." *Skinner v. Northrup Grumman Retirement Plan B*, 673 F.3d 1162, 1166 (9th Cir. 2012). Under California law, when a contract "does not truly express the intention of the parties," it may be reformed when there has been an instance of "fraud or a mutual mistake of the parties."  Cal. Civ. Code § 3399.

ANPAC contends that the parties mutually intended for ANPAC to issue, "an insurance policy that provides coverage for 'Airport Operations' and precludes coverage for 'Products and Completed Operations.'"  (ECF No. 54-1 at 17–18.)  ANPAC next states that Coulter and ANPAC made a mutual mistake when they failed to recognize the scrivener's error in the Policy. (ECF No. 54-1 at 19.)  Plaintiff argues in response that reformation would adversely affect Cavanaugh and Coulter's vested rights because reformation cannot be done without prejudicing Cavanaugh (ECF No. 61 at 10), and that summary judgment is inappropriate because there are triable issues of material fact as to how the Policy should read (ECF No. 61 at 11).  The Court will address the parties' arguments in turn.

a.     Mutual Intent of the Parties

California law provides that a court may reform an insurance policy to express the true

---

[4]     All Defendants move for summary judgment, but because the Court granted Aerospace Defendants' Motion for Judgment on the Pleadings, which dismissed Aerospace Defendants from this action, the Court will refer only to ANPAC in its discussion of the Motion for Summary Judgment.

intent of the parties. Cal. Civ. Code §3399. When reformation is sought, "the court may inquire what the instrument was intended to mean, and what were intended to be its legal consequences." *Appalachian Ins. Co. v. McDonnell Douglas Corp.*, 214 Cal. App. 3d 1, 19 (Ct. App. 1989). Under California Law, a written instrument is presumed to express the true intent of the parties. *Southland Corp. v. Emerald Oil Co.,* 789 F.2d 1441, 1446 (9th Cir. 1986) (citing *In re Beverly Hills Bancorp*, 649 F.2d 1329, 1333 (9th Cir. 1981).

ANPAC argues the Policy should be reformed because, as currently written, it does not reflect the contracting parties' true intentions. (ECF No. 54-1 at 16–18.) Plaintiff does not dispute the parties' true intentions. As explained above, each year Coulter purchased a policy through ANPAC, he purchased Hazard Division 1: Airport Operations coverage. (ECF No. 54-4 at 20, 39.) Hazard Division 1 in the Policy mistakenly excludes "liability arising out of Hazard Divisions 1 through 4." (ECF No. 54-4 at 46.) ANPAC seeks to reform the Policy to read, "excluding liability arising out of Hazard Divisions 2 through 4." (ECF No. 54-1 at 19.) ANPAC argues the revised language in the contract will conform to the parties' (Coulter and ANPAC's) true intentions. (ECF No. 54-1 at 17–18.)

Based on the full record of communications between Coulter, his insurance broker, and ANPAC's aviation managers, the Court finds Coulter intended to purchase coverage for "Airport Operations" only. (ECF No. 54-1 at 18–19.) The CID, which contains information regarding the insured's coverage and premium, shows Coulter purchased Airport Operations coverage only. (ECF No. 54-4 at 39.) And the remaining coverage options, including Products and Completed Operations, show "N/C," which means "not covered." (ECF No. 54-4 at 39; ECF No. 54-1 at 18.) The CID reflects the same information for each year Coulter purchased insurance. (*See, e.g.*, ECF No. 54-4 at 1, 20, 59, 87, 107.) In addition, Coulter paid an annual premium and the amount of the premium reflects the type of coverage purchased. *See Fid. & Deposit Co. v. Charter Oak Fire Ins. Co.*, 66 Cal. App. 4th 1080, 1086 (1998) ("The insured's payment of a relatively small premium suggests that [the insurer] provided coverage for the relatively small risks . . . [and] not the much larger risks. . .") *See also Herzog v. National American Ins. Co.*, 2 Cal. 3d 192, 197 (1970) (finding that insurance premiums are commensurate with the level of risk covered). The

13

Airport Operations premium is $1,788 and the Products and Completed Operations premium is $4,000.  (ECF No. 54-4 at 130.)  Each year, Coulter paid the same $1,788 premium to receive the same coverage: Airport Operations.  (ECF No. 54-1 at 18.)

Thus, the Policy as written does not appear to reflect the contracting parties' true intentions at the time of contracting.  *See Western Fed. Sav. & Loan Ass'n v. Heflin Corp.*, 797 F. Supp. 790, 792 (N. D. Cal. 1992) (holding that the court may revise a written contract when the contract as written "does not truly express the intentions of the parties") (quoting Cal. Civ. Code § 3399).  The parties' true intentions — that Coulter sought to, and in fact did purchase Airport Operations coverage each year from 2008–2013 — are well-supported by the record.  (*See* ECF No. 54-4 at 1, 39, 132, 133, 139, 144 (documents showing the parties' intention to include Hazard Division One in the 2008–2009 and 2009–2010 policies through explicit inclusion of Hazard Division One).)

Therefore, the Court finds that Coulter and ANPAC both intended the Policy to include coverage for Airport Operations.  To reform the Policy, the Court must next determine whether both parties were "mistaken about the content or effect of the contract."  *Skinner*, 673 F.3d at 1166 (citing the Restatement (Second) of Contracts § 155).

b.    Mutual Mistake of the Parties

A mistake is mutual, and the contract may be revised "to reflect the true intent of the parties[,] if both parties were mistaken about the content or effect of the contract."  *Skinner*, 673 F.3d at 1166 (citing Restatement (Second) of Contracts §155).  When a party seeks reformation due to mistake, a court may reform the contract "to capture the terms upon which the parties had a meeting of the minds."  *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 955 (9th Cir. 2014) (quoting *Skinner*, 673 F.3d at 1166).  Reformation due to mutual mistake requires clear and convincing evidence of the alleged mistake.  *Inamed Corp. v. Medmarc Cas. Ins. Co.*, 258 F. Supp. 2d 1117, 1123 (C.D. Cal. 2002) (citing *In re Beverly Hills Bancorp*, 649 F.2d at 1333).  Where each of the parties had the opportunity to read and review the contract, any error is considered a "mutual mistake."  *See* Cal. Civ. Code § 3990; *see also Shupe v. Nelson*, 254 Cal. App. 2d 693, 700 (1967) ("Where the failure of the written contract to express the intention of the

14

parties is due to the inadvertence of both of them, the mistake is mutual.").

No party involved in the annual transactions — ANPAC, Coulter, or his insurance broker — noticed the error in the Policy. *See Caliber One Indem. Co. v. Wade Cook Fin. Corp.*, 491 F.3d 1079, 1083 (9th Cir. 2007) ("Negligence in failing to observe that a writing does not express what has been assented to is not a bar to reformation of a contract when the reformation claim is based upon mutual . . . mistake."). Coulter's correspondence through his insurance broker indicated that he sought to purchase Airport Operations coverage because his broker confirmed this selection in an e-mail dated October 3, 2008, where she asked to bind the quote for "$1[,]788 for $1mil Premises only" and included the Declination. (ECF No. 54-4 at 132–33.) When ANPAC sent the defective Policy to Coulter for review, he made no mention of the mistake, and instead opted to renew "with no change to the policy" the following year. (*See* ECF 54-4 at 139.) The record reflects that both Coulter and ANPAC were mistaken about the actual terms of the Policy because both parties intended Coulter to have Airport Operations coverage, yet the Policy as written provided no Airport Operations coverage. *See Renshaw v. Happy Valley Water Co.*, 114 Cal. App. 2d 521, 524 (1952) ("By mutual mistake is meant a situation where both parties share the same misconception.")

The Court finds ANPAC has met its burden to show that the Policy, as written, does not reflect the contracting parties' intentions and is based upon mutual mistake. *Skinner*, 673 F.3d at 1166. Therefore, reformation is proper. By reforming the Policy to reflect the parties' intended coverage, the Court is "captur[ing] the terms upon which the parties had a meeting of the minds." *Skinner*, 673 F.3d at 1166. Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment to reform the Policy to read "excluding liability arising out of Hazard Divisions 2 through 4." Any other result would be contrary to the parties' true intentions.

### b. Vested Rights

Plaintiff's argument that reformation would adversely affect Cavanaugh and Coulter's vested rights is unpersuasive. (ECF No. 61 at 10–11.) Here, ANPAC seeks to expand coverage under the Policy by including Hazard Division 1, the very provision under which Plaintiff is seeking coverage. Plaintiff, relying on *Shapiro v. Republic Indemnity Co.*, argues that

Cavanaugh's interest cannot be "altered or conditioned by independent action of the insurer and the insured." (ECF No. 61 at 10 (quoting *Shapiro v. Republic Indemnity Co.*, 52 Cal. 2d 437, 439 (1959)).)

Shapiro is inapplicable. In *Shapiro*, the judgment creditor was not a party to the reformation action that resulted in the addition of an exclusion that precluded coverage. *Id.* at 439. The court held the judgment creditors' "rights [could not] be conclusively determined against [them] in an action to which they were not made parties." *Id.* at 440. Here, Plaintiff is a party to this reformation action and is seeking coverage under the very provision that ANPAC seeks to reform. Moreover, unlike *Shapiro*, reformation here will not add an exclusion to the Policy to preclude Plaintiff from recovering. "[I]t is settled that an insurance policy may be reformed to limit or exclude coverage if such was the intention of the parties, even where the rights of third party claimants who are not parties to the insurance contract are adversely affected." *Truck Ins. Exch. v. Wilshire Ins. Co.*, 8 Cal. App. 3d 553, 559 (1970). Accordingly, the Court finds that reformation would not adversely affect Cavanaugh and Coulter's vested rights.

c. Issue of Material Fact

Plaintiff's second argument — that there is a disputed issue of material fact regarding how Hazard Division 1 should be interpreted — is similarly unpersuasive. (ECF No. 61 at 11.) Plaintiff provides that the underwriter who issued the Policy declared that Airport Operations should exclude liability arising out of Hazard Divisions 2–5, while a different representative declared that the Airport Operations should exclude liability arising out of Hazard Divisions 2–4. (ECF No. 61 at 11.) Plaintiff argues these inconsistent statements demonstrate a disputed issue of material fact. (ECF No. 61 at 11.) ANPAC responds that the underwriter mistakenly referred to the Hallmark policy, which includes five Hazard Divisions, while the other representative discussed a Word document filed with the Department of Insurance, which document reflects four Hazard Divisions. (ECF No. 62 at 7.) ANPAC argues this difference in the documents explains the discrepancy in the statements. (ECF No. 62 at 7.) Moreover, ANPAC argues that even conceding that there is a disputed issue, the discrepancy is immaterial to the case because the

16

undisputed facts establish that "the insured, his broker and ANPAC all intended the policy to cover Hazard Division 1 and not Hazard Division 2." (ECF No. 62 at 7.)

The party opposing a motion for summary judgment must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248. Only factual disputes "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," and "factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Here, the differing statements made by the ANPAC representatives constitute a factual dispute that is irrelevant or unnecessary to the outcome of the present suit. *Id.* The parties do not dispute the fourth or fifth Hazard Divisions, nor do the parties dispute the total number of Hazard Divisions. (*See* ECF No. 61 at 11; ECF No. 62 at 7.) Rather, the parties dispute whether Hazard Division One should have been excluded or included. (*See* ECF No. 62 at 7.) This dispute does not rest on the total number of Hazard Divisions, nor on the contentions of ANPAC representatives about the total number of Hazard Divisions. Accordingly, the Court does not agree that the two differing declarations constitute evidence of a genuine issue of material fact. *See Anderson*, 477 U.S. at 248. Further, the Court is not persuaded that the differing declarations might affect the outcome of the suit under the governing law. *Id.* Rather, the Court finds that whether the two ANPAC representatives referred to a different number of total Hazard Divisions has no bearing on the interpretation of the Policy and Hazard Division One. Because the allegedly disputed fact is immaterial, it cannot preclude summary judgment in favor of ANPAC on its reformation claim.

### ii.      Breach of Contract Claim

ANPAC additionally moves for summary judgment on Plaintiff's breach of contract claim arguing the Underlying Action falls outside the Airport Operations coverage that Coulter purchased. (ECF No. 54-1 at 23–25.) ANPAC argues Airport Operations coverage (Hazard Division 1) explicitly carved out an exception for Products and Completed Operations (Hazard Division 2) performed by Coulter. (ECF No. 54-1 at 23.) Plaintiff argues the Underlying Action falls within the term "operations" used in the Airport Operations coverage. (ECF No. 61 at 13–15.)

In a claim for breach of contract, a plaintiff must establish: (1) a contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damage to plaintiff. *Nationwide Mutual Ins. Co. v. Ryan*, 36 F. Supp. 3d 930, 938 (N.D. Cal. 2014). Here, the third prong is dispositive, and thus the Court declines to address the remaining prongs.

As to the third prong, defendant's breach, an individual or entity breaches an insurance contract when the company "fail[s] to perform under the policy." *Lincoln Nat'l Life Ins. Co. v. Graham*, No. 2:12-cv-02177-SVW-RZ, 2012 WL 12893937, at *7 (C.D. Cal. Sept. 6, 2012); *see also Earth Elements, Inc. v. Nat'l Am. Ins. Co.*, 41 Cal. App. 4th 110, 114 (1995) (stating an insurance company breaches a contract when it wrongfully "fail[s] to provide coverage or defend a claim"). A plaintiff "has the burden to show that the underlying claim falls within an insurance policy's coverage." *James River Ins. Co. v. Medolac Lab.*, 290 F. Supp. 3d 956, 966–67 (C.D. Cal. 2018). "If any facts stated or fairly inferable in the complaint . . . suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage." *Id.* at 966 (quoting *S.B.C.C. Inc., v. St. Paul Fire & Marine Ins. Co.*, 186 Cal. App. 4th 383, 388–89 (2010)). However, if "neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise" in the first place, and thus the defendant could not have breached a contract. *Id.* (quoting *S.B.C.C. Inc.*, 186 Cal. App. 4th at 388–89).

Here, the Policy includes a provision for Airport Operations coverage for any bodily injury or property damage that arises from "the ownership, maintenance, operation or use of airport and all operations necessary thereto, excluding liability arising out of Hazard Divisions 2[5] through 4." (ECF No. 54-4 at 46.) The parties dispute whether Coulter's negligence in providing services, which resulted in the helicopter crash, constitute "operations" as used in the Policy. To establish a breach of contract, Plaintiff must show that Coulter's negligent services classify as "operations" and therefore, do not fall within the Policy's exclusion. *James River Ins. Co.*, 290 F. Supp. 3d at 966–67.

---

[5] The Court has reformed the Policy language above. Thus, the Policy language the Court refers to from this point forward reads "Hazard Divisions 2 through 4."

Plaintiff argues Coulter's negligent services constitute "operations," and thus, ANPAC had a duty to defend. (ECF No. 61 at 14–15.) ANPAC argues Coulter's negligent services fall squarely within the exclusion; therefore, ANPAC's duty to defend never arose because the Policy language shows there was no potential for coverage. (ECF No. 54-1 at 25; ECF No. 54-4 at 46). *See Saarman Constr., Ltd. v. Ironshore Specialty Ins. Co.*, 230 F. Supp. 3d 1068, 1075 (N.D. Cal. 2017) ("[W]here there is no potential for coverage, there is no duty to defend.") (quoting *La Jolla Beach & Tennis Club, Inc. v. Indust. Indem. Co.*, 9 Cal. 4th 27, 39 (1994). As the insured, Plaintiff "has the burden to show that the underlying claim falls within [ANPAC]'s policy's coverage." *James River Ins. Co.*, 290 F. Supp. 3d at 966–67. To determine whether there was "potential coverage, and thus [ANPAC had] a duty to defend, courts generally compare the allegations in the underlying complaint with the terms of the insurance policy." *Saarman Constr., Ltd.*, 230 F. Supp. 3d at 1076. Plaintiff argues there was a potential for coverage under the policy because Coulter's negligent services may be classified as "operations" under Hazard Division 1. (ECF No. 61 at 15.) As discussed above, Coulter's Policy specifically excluded liability under Hazard Division 2 for "service operations performed by [Coulter] in connection with the ownership, maintenance, operation or use of the airport." (ECF No. 54-4 at 46.) Generally, an insurance policy's exclusions should be "interpreted narrowly against the insurer." *Energy Ins. Mutual Ltd. v. Ace Am. Ins. Co.*, 14 Cal. App. 5th 281, 291 (2017). However, where the exclusionary clause is "conspicuous, plain, and clear," the insured "could not reasonably expect that [claims that fall outside the exclusionary language] would be covered under the policy." *Id.* at 291, 300.

The Court finds *Hallmark Am. Ins. Co. v. Broyles* instructive in determining whether Coulter's services fall within the Policy's coverage or whether the Policy excluded liability. *Hallmark Am. Ins. Co. v. Broyles*, No. 15-cv-05536-RS, 2016 WL 4951079 (N.D. Cal. Sep. 15, 2016). In *Broyles*, an injured pilot and his wife sued an airplane servicer following a plane crash. *Id.* at *1. The airplane servicer and the servicer's insurance company, Hallmark, sought to limit the maximum exposure under the policy issued to the airplane servicer. *Id.* The court analyzed coverage under the policy's enumerated provisions titled Division 1 "Airport Operations" and

Division 2 "Products and Completed Operations," a nearly identical insurance policy to the Policy in the case at hand.[6]  *Id.* at \*2–4.  The plaintiffs sued the defendant arguing both Divisions 1 and 2 provided coverage for the repair services the defendant had provided on the plaintiff's airplane.  *Id.* at \*1–3.  The court found Division 1 protected the insured for "any liabilities that might arise from [the insured]'s presence at, and use of, the airport facilities other than those arising from its service operations."  *Id.* at \*3.  Moreover, the court stated that "[t]he only coverage triggered under the facts here is that provided in Division 2," and declined to find that plaintiffs were entitled to coverage under Division 1.  *Id.* at \*4.

Here, Coulter opted to purchase Airport Operations coverage and declined coverage for claims arising out of his *completed operations* under Hazard Division 2.  (*See* ECF No. 54-4 at 39.)  Like in *Broyles*, Hazard Division 1 covers solely the liabilities enumerated in that Division.  *Broyles*, 2016 WL 4951079 at \*3.  Also like in *Broyles*, the Policy specifically excludes coverage for "[s]ervice operations, performed by [Coulter] in connection with the ownership, maintenance, operation or use of the airport."  (ECF No. 54-4 at 46.)  Coulter's services were just that: service operations performed in connection with the ownership or maintenance of the helicopter.  The Court finds there is "no basis to disregard the clear policy language."  *Broyles*, 2016 WL 4951079 at \*3; *see also MacKinnon*, 31 Cal. 4th at 650 (cautioning against "interpreting an exclusionary clause so broadly that it logically leads to absurd results").  Accordingly, the Court finds Coulter's negligent services are not "operations" as used in Hazard Division 1.

Thus, Plaintiff has failed to establish that Coulter's negligent conduct "is within the basic scope of the insurance coverage."  *Saarman Constr, Ltd.*, 230 F. Supp. 3d at 1076 (quoting *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1188 (1998)).  Because Coulter's services fall outside of his Policy, ANPAC did not breach the contract by refusing to defend because it did not have any duty to defend.  *See id.* at 1075 (stating, "[w]here there is no potential for coverage,

---

[6]     The insurance policies in *Broyles* provide: Division 1, titled "Airport Operations," "refers to liability arising out of your ownership, maintenance, operation or use of the airport, and all of your operations at the airport necessary or incidental thereto, excluding liability arising out of goods or product manufacturing, sales, distribution or services operations performed by you."  *Broyles*, 2016 WL 4951079 at \*2.  Division 2, titled "Products and Completed Operations," states "[s]ervice operations performed by you in connection with the ownership, maintenance, operation or use of the airport if the occurred happens after the services have been completed or abandoned."  *Id.* at \*3.

there is no duty to defend"). Accordingly, the Court GRANTS Defendant ANPAC's Motion for Summary Judgment as to Plaintiff's Second Cause of Action for Breach of Contract. (ECF No. 54.)

      *iii.*  *Breach of the Implied Covenant of Good Faith and Fair Dealing*

   Plaintiff argues ANPAC also breached the implied covenant of good faith and fair dealing. (ECF No. 1 at 5.) Plaintiff argues ANPAC acted unreasonably and in bad faith by failing to defend or indemnify Coulter. (ECF No. 1 at 5; ECF No. 61 at 19.) ANPAC argues this claim cannot survive because there was no breach of contract. (ECF No. 54-1 at 25.)

   In California, "all contracts contain an implied covenant of good faith and fair dealing." *San Jose Prod. Credit Ass'n v. Old Rep. Life Ins. Co.*, 723 F.2d 700, 703 (9th Cir. 1984). "This covenant requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement." *Id* (quoting *Egan v. Mutual of Omaha Insurance Co.*, 24 Cal. 3d 809, 818 (1979)). However, "if there is no potential for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 35 (1995). The "absence of coverage under the [insurance] policy conclusively negates the [insured's] cause of action for bad faith breach of contract as no duty to indemnify or defend existed." *Modern Dev. Co. v. Navigators Ins. Co.*, 111 Cal. App. 4th 932, 943 (2003) (citing *Horsemen's Benevolent & Prot. Ass'n v. Ins. Co. of No. Am.*, 222 Cal. App. 3d 816, 822 (1990)).

   ANPAC did not breach the contract because no potential for coverage existed under Coulter's Policy, thus there can be no cause of action for breach of the implied covenant of good faith and fair dealing. *See Waller*, 11 Cal. 4th at 36 (stating, "absent that contractual right, however, the implied covenant has nothing upon which to act as a supplement and should not be endowed with an existence independent of its contractual underpinnings"). Accordingly, the Court GRANTS Defendant ANPAC's Motion for Summary Judgment on Plaintiff's Third Cause of Action for Breach of Implied Covenant of Good Faith and Fair Dealing.

   Further, because Plaintiff's underlying breach of contract claim fails, the claim for

punitive damages fails as well.  Regardless, "punitive damages are not available for breaches of contract."  *Tibbs v. Great Am. Ins. Co.*, 755 F.2d 1370, 1375 (9th Cir. 1985).[7]  Thus, the Court GRANTS Defendant ANPAC's Motion for Summary Judgment on Plaintiff's punitive damages claim.

### IV.  CONCLUSION

For the foregoing reasons, the Court hereby GRANTS the Aerospace Defendants' Motion for Judgment on the Pleadings (ECF No. 53) and Defendant ANPAC's Motion for Summary Judgment.  (ECF No. 54.) The Clerk of the Court shall enter judgment in Defendants' favor on all claims for relief.  The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated: June 4, 2019

Troy L. Nunley
United States District Judge

---

[7]     Even assuming the Court found a breach and the law provided for punitive damages, Plaintiff has failed to allege any conduct by ANPAC which rises to the level of "oppression, fraud, or malice."  Cal. Civ. Code § 3294(a) (stating that punitive damages are appropriate where the moving party proves "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice").

22